**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

JEFFREY KPAKPOE-AWEI,
*on behalf of himself and others similarly situated*,

      Plaintiff,

          v.

STORCK USA, L.P.

      Defendant.

———————————————————————

Case No.:

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

    Plaintiff JEFFREY KPAKPOE-AWEI (hereinafter, "Plaintiff KPAKPOE-AWEI" or "Plaintiff"), individually and on behalf of all other persons similarly situated in New York and the United States, by his undersigned attorneys, pursuant to this Class Action Complaint against the Defendant, STORCK USA, L.P., alleges the following:

## NATURE OF THE ACTION

    1.    This is a consumer protection action arising out of the deceptive and otherwise improper business practices that Defendant, STORCK USA, L.P. (hereinafter, "Storck" or "Defendant"), engages in with respect to the packaging of its 2.75 ounce bag of Werther's Original Sugar Free Chew Caramels candy product (hereinafter, the "Product"), which is regularly sold at brick-and-mortar stores, such was Walgreens, and online. The Product

packaging misrepresents two things: a) the amount of candy in each Product bag, and b) the effect the Product has on blood glucose levels.

2.    The Product is mass produced and packaged in non-transparent plastic bags of standardized size, with a standardized quantity of candy in each bag. Below is an image of how the Product appears:



3.    Plaintiff brings this proposed consumer class action on behalf of herself and all other persons who, from the applicable limitations period up to and including the present (the "Class Period"), purchased the Product for consumption and not for resale.

4.      During the Class Period, Defendant manufactured, marketed and sold the Product throughout the United States and the State of New York. Defendant purposefully sold the Product with non-functional slack-fill as part of a systematic practice and misrepresented the effect the Product has on blood glucose levels.

5.      Defendant violated statutes enacted in each of the fifty states and the District of Columbia that are designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising. These statutes are:

1)  Alabama Deceptive Trade Practices Act, Ala. Statues Ann. § 8-19-1, *et seq.*;
2)  Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.*;
3)  Arizona Consumer Fraud Act, Arizona Revised Statutes, § 44-1521, *et seq.*;
4)  Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.*;
5)  California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.*;
6)  Colorado Consumer Protection Act, Colo. Rev. Stat. § 6 - 1-101, *et seq.*;
7)  Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.*;
8)  Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.*;
9)  District of Columbia Consumer Protection Procedures Act, D.C. Code § 28 3901, *et seq.*;
10) Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;
11) Georgia Fair Business Practices Act, § 10-1-390 *et seq.*;
12) Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statutes § 480 1*, et seq.*, and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.*;
13) Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;
14) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS Section 505/1, *et seq.*;
15) Indiana Deceptive Consumer Sales Act, Indiana Code Ann. § 24-5-0.5-0.1, *et seq.*;
16) Iowa Consumer Fraud Act, Iowa Code § 714.16, *et seq.*;
17) Kansas Consumer Protection Act, Kan. Stat. Ann § 50 626, *et seq.*;
18) Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann § 365.020, *et seq.*;
19) Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1401, *et seq.*;
20) Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.*;
21) Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.*;
22) Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;
23) Michigan Consumer Protection Act, § 445.901, *et seq.*;
24) Minnesota Prevention of Consumer Fraud Act, Minn. Stat § 325F.68, *et seq.*, and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;
25) Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*;
26) Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;
27) Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.*;

28) Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.*;

29) Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*;

30) New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.* ;

31) New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8 1, *et seq.*;

32) New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57 12 1, *et seq.*;

33) New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349, *et seq.*, and New York False Advertising, N.Y. Gen. Bus. Law § 350, *et seq.*;

34) North Dakota Consumer Fraud Act, N.D. Cent. Code § 51 15 01, *et seq.*;

35) North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes § 75-1, *et seq.*;

36) Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. § 4165.01. *et seq.*;

37) Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.*;

38) Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.*;

39) Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § 201-1, *et seq.*;

40) Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

41) South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.*;

42) South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws § 37 24 1, *et seq.*;

43) Tennessee Trade Practices Act, Tennessee Code Annotated § 47-25-101, *et seq.*;

44) Texas Stat. Ann. § 17.41, *et seq.*, Texas Deceptive Trade Practices Act, *et seq.*;

45) Utah Unfair Practices Act, Utah Code Ann. § 13-5-1, *et seq.*;

46) Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.*;

47) Virginia Consumer Protection Act, Virginia Code Ann. §59.1-196, *et seq.*;

48) Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, *et seq.*;

49) West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.*;

50) Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100. 18, *et seq.*;

51) Wyoming Consumer Protection Act, Wyoming Stat. Ann. § 40-12-101, *et seq.*

6.      Defendant has deceived Plaintiff and other consumers by inducing Plaintiff and Class members to reasonably rely on Defendant's misrepresentations and purchase the Product which they would not have purchased at the given price had they known the truth. Through these unfair and deceptive practices, Defendant has collected millions of dollars from the sale of its Product that it would not have otherwise earned. Plaintiff brings this action to stop Defendant's deceptive practice.

7.      Plaintiff expressly does not seek to enforce any state law that has requirements beyond those established by federal laws or regulations.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

9.     The Court has jurisdiction over the federal claims alleged herein pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

10.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendant, pursuant to New York Statute N.Y. CVP. Law § 302, because it conducts substantial business in this District. Some of the actions giving rise to the Complaint took place in this District, and Plaintiff's claims arise out of Defendant operating, conducting, engaging in or carrying on a business or business venture in this state or having an office or agency in this state; committing a tortious act in this state; and causing injury to person or property in this state arising out of Defendant's acts and omissions outside this state. Additionally, this court has personal jurisdiction over Defendant because its Product is advertised, marketed, distributed, and sold throughout New York State; Defendant engages in the wrongdoing alleged in this Complaint throughout the United States, including in New York State; and Defendant has sufficient minimum contacts with New York and/or has intentionally availed itself of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant is engages in substantial and not isolated activity within New York State.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, the

Defendant has caused harm to class members residing in this District, and the Defendant is a resident of this District under 28 U.S.C. 1391(c)(2) because it is subject to personal jurisdiction in this district.

## PARTIES

*Plaintiff*

12.    Plaintiff KPAKPOE-AWEI is, and at all relevant times hereto has been, a citizen of the state of New York and a resident of Westchester County. On December 28, 2017, Plaintiff KPAKPOE-AWEI purchased a Product bag containing 2.75 oz. of Werther's Sugar Free Caramel candy for personal consumption. Plaintiff KPAKPOE-AWEI purchased the Product in Westchester County. Plaintiff KPAKPOE-AWEI purchased the Product for $3.58, and was financially injured as a result of Defendant's deceptive conduct as alleged herein because she did not receive the quantity that she paid for and was promised. Plaintiff KPAKPOE-AWEI paid to receive a bag of candy that was functionally full, but the bag Plaintiff KPAKPOE-AWEI received contained approximately 60% slack-fill, most of which was non-functional slack-fill.

13.    As the result of Defendant's deceptive conduct as alleged herein, Plaintiff KPAKPOE-AWEI was injured when he paid full price for the Product but did not receive a full container. Plaintiff was economically injured by the shortfall in her Product bag. Her injury was equivalent to the proportion of her purchase price that paid for non-functional slack-fill in the Product. Should Plaintiff KPAKPOE-AWEI encounter the Product in the future, he could not rely on the truthfulness of the packaging, absent corrective changes. Plaintiff KPAKPOE-AWEI would still be willing to purchase the Product in its current formulation, as long as he is not compelled to pay for empty space within the container when buying the Product.

*Defendant*

14.    Defendant STORCK USA, L.P. is a corporation organized under the laws of Illinois with its headquarters at 325 North LaSalle Suite 400, Chicago, Illinois 60654. Defendant manufactures, packages, distributes, advertises, markets, and sells the Product to millions of customers nationwide. Defendant's address for service of process is at CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

15.    The labeling, packaging, and advertising for the Product, relied upon by Plaintiff, were prepared and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through advertising containing the misrepresentations alleged herein. Such labeling, packaging and advertising were designed to encourage consumers to purchase the Product and misled reasonable consumers, including Plaintiff and the Class, into purchasing the Product. Defendant owns, markets and distributes the Product, and creates and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive labeling, packaging and advertising for the Product.

## FACTUAL ALLEGATIONS

### Identical Federal and State Law Prohibit Misbranded Foods with Non-Functional Slack-Fill

16.    Under § 403(d) of the FDCA (21 U.S.C. § 343(d)), a food shall be deemed to be misbranded "[i]f its container is so made, formed, or filled as to be misleading."

17.    The FDA has implemented § 403(d) through 21 C.F.R. § 100.100, which states:

In accordance with section 403(d) of the act, a food shall be deemed to be misbranded if its container is so made, formed, or filled as to be misleading.

(a) A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill. Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack-fill is the empty space in a package that is filled to less than its capacity for reasons other than:

(1) Protection of the contents of the package;

(2) The requirements of the machines used for enclosing the contents in such package;

(3) Unavoidable product settling during shipping and handling;

(4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;

(5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages; or

(6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other non-mandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).

18.     The food labeling laws and regulations of New York impose requirements which mirror federal law.

19.     New York Agm. Law § 201 specifically provides that "[f]ood shall be deemed to be misbranded . . . If its container is so made, formed, colored or filled as to be misleading." Moreover, Part 259.1 of Title 1 of the New York Codes, Rules and Regulations (1 NYCRR § 259.1), incorporates by reference the regulatory requirements for food labeling under the FDCA:

 "For the purpose of the enforcement of article 17 of the Agriculture and Markets Law, and except where in conflict with the statutes of this State or with rules and regulations promulgated by the commissioner, the commissioner hereby adopts the current regulations as they appear in title 21 of the *Code of Federal Regulations* (revised as of April 1, 2013) . . . in the area of food packaging and labeling as follows: . . . (2) Part 100 of title 21 of the *Code of Federal Regulations* [21 C.F.R. 100 et seq.], containing Federal definitions and standards for food packaging and labeling *General* at pages 5-10. . . ."

1 NYCRR § 259.1(a)(2).

20.    Courts have noted the incorporation of FDA regulations into New York law in evaluating claims brought under NY GBL § 349. *See Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156, at *13 (E.D.N.Y. July 21, 2010) ("New York's Agriculture and Marketing law similarly provides in relevant part that food shall be deemed misbranded '[i]f its labeling is false or misleading in any particular,' and incorporates the FDCA's labeling provisions"); *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-cv-04697 (CM), 2016 U.S. Dist. LEXIS 149795, at *11 (S.D.N.Y. Oct. 26, 2016) ("Here [in a slack-fill case brought under NY GBL § 349], New York law expressly incorporates the standard imposed by the FDCA.").

## Defendant's Product Contains Non-Functional Slack-Fill

21.    Defendant manufactures, markets and sells the Product with non-functional slack-fill (unnecessary empty space) in violation of the Federal Food Drug & Cosmetic Act ("FDCA") Section 403(d) (21 U.S.C. 343(d)), the Code of Federal Regulations Title 21 part 100, et. seq., as well as the laws of New York State, the other 49 states, and the District of Columbia which impose requirements identical to federal law. Defendant's bags are consequently made, formed or filled as to be misleading.

22.    Slack-fill is air or filler material within a packaged product. Non-functional slack-fill is slack-fill that serves no legitimate purpose, and misleads consumers about the quantity of food they are purchasing. When consumers purchase a package of Defendant's Product, they are getting less candy than they bargained for. They are effectively tricked into paying for air, because the Product bags contain large amounts of non-functional slack-fill.

23.    The size of the Product's bags in comparison to the volume of the candy contained therein makes it appear to Plaintiff and Class members that they are buying more than

what is actually being sold. Plaintiff and Class members are denied the benefit of their bargain because they pay for full bags of the Product but actually receive far less.

24.    The Product is packaged in a partially non-transparent plastic bag so that Plaintiff and Class members cannot see the non-functional slack-fill in the container. Below is an image of how the bag appears once opened:

25.    The Werther's Product package is a bag that is approximately 7.5 inches in height (with 1 inch of the bag sealed, and 6.5 inches of vertical capacity) and 5.5 inches in width. The candy only fills the bottom 2 inches of the bag, with 4.5 vertical inches of air.[1] The candy occupies 31%[2] of the bag; air occupies the other 69% of the bag, leaving 69% slack-fill[3]:



**Approximate Vertical Capacity: 6.5 inches**

**Approximate Height of Candy: 2 inches**

---

[1] 6.5 inches of vertical capacity – 2 inches of candy = 4.5 inches of slack-fill.

[2] $\dfrac{2 \text{ inches of candy}}{6.5 \text{ inches of vertical capacity}}$ = Approximately 31% of the Product bag is filled with candy.

[3] $\dfrac{4.5 \text{ inches of slack-fill}}{6.5 \text{ inches of vertical capacity}}$ = Approximately 69% slack-fill is in the Product bag.

26.    While some of Defendant's slack-fill may have functional justifications related to packaging requirements or the effects of settling, Defendant's total slack-fill far exceeds the amount necessary, and almost all of the slack-fill is therefore nonfunctional. This is proven by the fact that the slack-fill in Defendant's Product is significantly greater than the slack-fill in the packaging of its own product. The 5.0 oz. Werther's Chewy Caramels candy product (hereinafter, "Werther's 5.0"), is approximately the same size as the Product, but contains substantially more candy. Below is a comparison of the slack-fill in the Product (left) with the slack-fill in the Werther's 5.0 bag (right):



27.    The Werther's 5.0 bag is 7.75 inches in height (with 6.75 inches of vertical capacity) and 5.8125 inches in width. By contrast, the Product's bag dimensions are 7.5 inches (with 6.5 inches of vertical capacity) and 5.5 inches in width. The two bags are approximately the same size.

28.    The candy inside the Werther's 5.0 bag fills approximately 4.5 inches of the bag, leaving only about 2.25 inches of empty space at the top of the bag, i.e. merely 33%[4] slack-fill, significantly less than the 69% slack-fill in the Product.

29.    Defendant cannot plausibly argue that it could not fit more candy in the Product bag because Defendant's own product shows that it can fit nearly twice as much candy, in a substantially similar bag.

30.    The Werther's 5.0 bag has 33% slack-fill. The slack-fill in the Smaller Werther's bag may or may not all be functional, but a bag of Werther's candy needs no more than 33% slack-fill. Slack-fill in excess of 33% in the Product is **certainly** non-functional, as the comparable Werther's 5.0 bag demonstrates, so all slack-fill in the Product in excess of 33% is certainly non-functional. However, Defendant fraudulently induces sales at inflated prices by tricking consumers into believing that they are purchasing a bag containing only a). candy and b). the amount of slack-fill that is necessary, i.e. approximately 33% slack-fill. The Product bags have significant amounts of non-functional slack-fill instead of candy, so consumers who purchased the Product received far less candy than they bargained for.

**The Safe-Harbor Provisions of 21 C.F.R. § 100.100 Do Not Justify the Slack-Fill in Defendant's Products**

31.    The FDA has defined non-functional slack-fill as any slack-fill in excess of that required to achieve the functional purposes listed in 21 C.F.R. § 100.100(a):

> FDA advises that the exceptions to the definition of "nonfunctional slack-fill" in § 100.100(a) apply to that portion of the slack-fill within a container that is necessary for, or results from, a specific function or practice, e.g., the need to protect a product. Slack-fill in excess of that necessary to accomplish a particular function is nonfunctional slack-fill. Thus, the exceptions in § 100.100(a) provide only for that amount of slack-fill that is necessary to accomplish a specific function. FDA

---

[4] $\dfrac{6.75 \text{ inches of vertical capacity} - 2.25 \text{ inches of candy}}{6.75 \text{ inches of vertical capacity}}$ = Approximately 33% slack-fill.

advises that <u>these exceptions do not exempt broad categories of food</u>, such as gift products and convenience foods, from the requirements of section 403(d) of the act. For example, § 100.100(a)(2) recognizes that some slack-fill may be necessary to accommodate requirements of the machines used to enclose a product in its container and is therefore functional slack-fill. However, § 100.100(a)(2) <u>does not exempt all levels of slack-fill in all mechanically packaged products from the definition of nonfunctional slack-fill</u>.

58 FR 64123, 64126 [emphasis added].

32.    Thus, the possibility that some portion of the slack-fill in Defendant's Product may be justified as functional based on the exemptions in §100.100(a) does not justify slack-fill that is in excess of that required to serve a legitimate purpose—protecting contents, accommodating the machines that enclose the contents, accommodating settling, etc. Such slack-fill serves no purpose other than to mislead consumers about the quantity of food they are actually purchasing. *See Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 405 (E.D.N.Y. 2010) ("Misleading consumers is not a valid reason to package a product with slack-fill. *See* 21 C.F.R. § 100.100(a)(1–6).").

33.    The fact that Defendant's Product contains slack-fill in excess of what is permitted under § 100.100 is proven by the fact that other similarly sized candy bags contain significantly less slack-fill. As shown above, Defendant's own similarly sized bag contains significantly less slack-fill, and thus more candy, despite being under the same constraints as Defendant as to factors such as the need to protect package contents, accommodate machines, and settling.

34.    The comparison is between the same kind of products in the same kind of packaging that is enclosed in the same way by the same kind of technology. And yet Defendant was able to package its candy in a way that leaves consumers with a more accurate sense of how much food they are actually purchasing. Thus, whatever real constraints <u>might</u> justify the slack-fill in the competitor candies cannot explain the excess slack-fill (shortfall) in the Junior Mints®

13

Product. This logic applies for every safe-harbor provision of 21 C.F.R. § 100.100(a)(1–6), as follows:

**(1) Protection of the contents of the package;**

35.    Defendant packages its Wether's 5.0 candies and protects its candy with far less slack-fill than is in the Product. Any slack-fill in the Product that exceeds the amount of slack-fill in Defendant's other product therefore clearly does not qualify for this safe harbor because that slack is demonstrably not necessary to protect the contents of the package.

**(2) The requirements of the machines used for enclosing the contents in such package;**

36.    Defendant packages its Werther's 5.0 candy and encloses the candy in substantially similar plastic bags with far less slack-fill than is in the Product. Any slack-fill in the Product that exceeds the amount of slack-fill in Defendant's other product therefore clearly does not qualify for this safe harbor because machines that enclose candy do not require such extensive slack-fill.

**(3) Unavoidable product settling during shipping and handling;**

37.    The Product is chewy caramel. There is little or no setting for this type of candy. Defendant's own candies with similar composition, such as Defendant's 5.0 oz Werther's caramels, undergo the same minimal or zero amount of settling, but any such settling in Werther's 5.0 does not create total slack-fill of more than about 33%. This is in contrast to the 69% slack-fill that is in the Product. Any slack-fill in the Product that exceeds the amount of slack-fill in Defendant's own product therefore clearly does not qualify for this safe harbor because caramel candy demonstrably can be shipped without 69% settling. Neither settling nor any other cause introduces such a large amount of slack-fill into Defendant's Werther's 5.0, therefore the slack-fill in the Product that is in excess of the slack-fill in Defendant's Werther's

5.0 is demonstrably not "unavoidable" because other manufacturers in fact avoid it, so the safe harbor does not apply to the Product.

> **(4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;**

38.  Defendant's Werther's 5.0 candy in substantially identical packaging is designed to be eaten in the same manner as the Product, but nothing about this compels the competitor to introduce slack-fill in its candy bags. Any slack-fill in the Product that exceeds the amount of slack-fill in Werther's 5.0 product therefore does not qualify for this safe harbor because there is no special function performed by the packaging that requires this slack-fill in a candy bag (and if there is such a function it is not communicated to consumers).

> **(5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages;**

39.  This safe-harbor equally does not apply to the Product's candy bag because the plastic bag is not significantly valuable.

> **(6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other non-mandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).**

40.  Defendant's Werther's 5.0 candy is packaged and sold in the same stores as the Products in packages of similar size, but nothing about this prevents Defendant from fully filling its Werther's 5.0 candy bags with only candy and functional slack-fill. Any slack-fill in the Product that exceeds the amount of slack-fill in the Werther's 5.0 product therefore clearly does

not qualify for this safe harbor because it is demonstrably possible to simply fill the bags with candy until there is less than 33% slack remaining, as shown by Defendant's own candy product.

**Plaintiffs and the Class Reasonably Relied on the Size of the Product's Packaging as a Material Indicator of How Much Food They Were Purchasing**

41.    At the point of sale, Plaintiff and Class members did not know, and had no reason to know, that the Product contained non-functional slack-fill as set forth herein, and consumers would not have bought the Product at the given prices had they known the truth about them.

42.    Defendant's Product packaging is a material factor in Plaintiff and Class members' decisions to purchase the Product because reasonable consumers would attach importance to the quantity of food they believe they are purchasing.

43.    Plaintiff and the Class reasonably relied on the size of the Product's packaging to infer how much food they were purchasing and reasonably believed that the boxes were filled as closely to capacity as functionally possible. The FDA has explained why such reliance is reasonable:

> Consumers develop expectations as to the amount of product they are purchasing based, at least in part, on the size of the container. The congressional report that accompanied the FPLA stated: "Packages have replaced the salesman. Therefore, it is urgently required that the information set forth on these packages be sufficiently adequate to apprise the consumer of their contents and to enable the purchaser to make value comparisons among comparable products" (H.R. 2076, 89th Cong., 2d sess., p. 7 (September 23, 1966)). Thus, packaging becomes the "final salesman" between the manufacturer and the consumer, communicating information about the quantity and quality of product in a container. Further, Congress stated (S. Rept. 361, supra at 9) that "Packages only partly filled create a false impression as to the quantity of food which they contain despite the declaration of quantity of contents on the label."

58 FR 64123, 64131 [emphasis added].

44.    Congress recognized that the size of a package is in and of itself a kind of sales pitch, even if not made with words or numbers. Thus, consumers can reasonably rely on packaging size as a representation of quantity regardless of whatever is printed on the label.  And

manufacturers can be held responsible for non-functional slack-fill regardless of whatever else they say.

## Reasonable Consumers Rely on Label Representations and Are Not Required to Manipulate Food Packaging

45.     Defendant might argue that Plaintiff and the Class should not have relied on the packaging's size to infer its contents because they could have manipulated the packaging in order to acquire a sense of the slack-fill therein (i.e., shaking the package to hear the candy rustling or poking it to feel the air), but the FDA has stated that such manipulation cannot be reasonably expected of consumers:

> FDA advises that the entire container does not need to be transparent to allow consumers to fully view its contents, i.e., a transparent lid may be sufficient depending on the conformation of the package. On the other hand, FDA finds that devices, such as a window at the bottom of a package, that require consumers to manipulate the package, e.g., turning it upside down and shaking it to redistribute the contents, do not allow consumers to fully view the contents of a container. FDA finds that such devices do not adequately ensure that consumers will not be misled as to the amount of product in a package. Therefore, such foods remain subject to the requirements in § 100.100(a) that slack-fill in the container be functional slack-fill.

58 FR 64123, 64128 [emphasis added].

46.     Here, the FDA was contemplating a scenario in which manipulating a package might permit an accurate visual estimate of its contents. This is clearly impossible in the case of Defendant's wholly non-transparent packaging, which can only provide audial or tactile clues as to the Product's slack-fill. But the same basic principle applies: the possibility that manipulating a package might yield additional insight into its contents does not exculpate non-functional slack-fill (just as accurate net weight disclosures do not). The possibility of manipulating a partially transparent package (that has a window) to discover the truth about it does not mitigate the false statement conveyed by the disproportionately large size of the product packaging.

17

Likewise the existence of true label statements regarding weight and quantity (if any) do not diminish Defendant's wrongdoing in using a false and misleading packaging size.

**The Products' Packaging is Misleading Because it Misrepresents the Volume of Candy Contained Within, Regardless of Whether Label Statements Regarding Weight are True**

47.    Even if Defendant's net weight disclosures are accurate, such does not eliminate this basic deception caused by Defendant's false representation of quantity because the mere presence of a true statement does not cure associated fraudulent statements. The FDA has confirmed this in unequivocal terms:

> FDA disagrees with the comments that stated that net weight statements protect against misleading fill. FDA finds that the presence of an accurate net weight statement does not eliminate the misbranding that occurs when a container is made, formed, or filled so as to be misleading.

58 FR 64123, 64128 [emphasis added].

> Section 403(e) of the act requires packaged food to bear a label containing an accurate statement of the quantity of contents. This requirement is separate and in addition to section 403(d) of the act. To rule that an accurate net weight statement protects against misleading fill would render the prohibition against misleading fill in section 403(d) of the act redundant. In fact, Congress stated (S. Rept. No. 493, 73d Cong., 2d sess. 9 (1934)) in arriving at section 403(d) of the act that section is "intended to reach deceptive methods of filling where the package is only partly filled and, despite the declaration of quantity of contents on the label, creates the impression that it contains more food than it does." Thus, Congress clearly intended that failure to comply with either section would render a food to be misbranded.

58 FR 64123, 64128-64129 [emphasis added].

48.    Independently from the text on the Product labels and regardless of their text's accuracy or inaccuracy, the size of the Product packaging makes a representation about the quantity of candy it contains. For Defendant's Product, this representation is false. False product representations are false and unlawful even if a manufacturer also makes some true claims about its product.

18

49. Even if consumers had come to expect significant slack-fill in boxed candy products, this too would not have eliminated Defendant's deception. The FDA has stated that "although consumers may become used to the presence of nonfunctional slack-fill in a particular product or product line, the recurrence of slack-fill over an extended period of time does not legitimize such slack-fill if it is nonfunctional." 58 FR 64123, 64131.

50. The Product is misbranded regardless of any disclosures about contents settling and regardless of whether or not weight is labeled accurately. Under Federal regulations, "label statements cannot correct nonfunctional or misleading fill." Misleading Containers; Nonfunctional Slack-Fill, 58 Fed. Reg. 64123-01, 64129 (Dec. 6, 1993) (codified at 21 C.F.R. pt. 100).

51. As the FDA explains in the Federal Register:

Consumers develop expectations as to the amount of product they are purchasing based, at least in part, on the size of the container. The congressional report that accompanied the FPLA stated: "Packages have replaced the salesman. Therefore, it is urgently required that the information set forth on these packages be sufficiently adequate to apprise the consumer of their contents and to enable the purchaser to make value comparisons among comparable products" (H.R. 2076, 89th Cong., 2d sess., p. 7 (September 23, 1966)). Thus, packaging becomes the "final salesman" between the manufacturer and the consumer, communicating information about the quantity and quality of product in a container. Further, Congress stated (S. Rept. 361, supra at 9) that "Packages only partly filled create a false impression as to the quantity of food which they contain despite the declaration of quantity of contents on the label."

58 Fed. Reg. 64123-01, 64131 (Dec. 6, 1993) (codified at 21 C.F.R. pt. 100) (emphasis added).

52. The presence of true label statements on the Product's packaging regarding weight and number of servings, if any, would not and could not mitigate the false implicit statement of quantity made by the package size. Reasonable consumers such as Plaintiff and the Class expected no more air in the packaging than would be present in other candies such as Defendant's 5.0 oz Wether's product. Consumers were injured to the extent that Defendant

under-filled the Product containers. Plaintiff and the Class' damages are simply the proportion of the Product purchase price that Defendant collected from Plaintiff and the Class equivalent to the percent of non-functional slack-fill.

53.     Courts have noted the incorporation of FDA regulations into New York law in evaluating claims brought under NY GBL § 349. *See Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156, at *13 (E.D.N.Y. July 21, 2010) ("New York's Agriculture and Marketing law similarly provides in relevant part that food shall be deemed misbranded '[i]f its labeling is false or misleading in any particular,' and incorporates the FDCA's labeling provisions").

**An Accurate Unit Count Could Not Cure Defendant's Deception**

54.     Defendant's false representation of quantity, created by the **size** of the Product packages, cannot be cured by a **written** weight or count representation. A disclosure that Plaintiff's box contained a particular number of pieces of candy would not establish its fill level because it implies nothing about the *size* of those pieces – and thus about the amount of candy that is actually in the box. As explained in *United States v. 174 Cases*:

> The question was not whether the ordinary purchaser would expect to find a particular number of individual candies in the box but whether such a purchaser would expect to find more of the Delson box filled. For example, the purchaser of a crate of apples opens the crate and finds it half filled. To determine whether he was deceived we do not ask whether he expected to find a particular number of individual apples in the crate. We do ask whether he expected to find more of the crate filled. This is the pertinent question. People do not think in terms of the number of individual mints when buying them in containers.

*United States v. 174 Cases*, 287 F.2d 246, 247-48 (3d Cir. 1961)

*See also Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 479-80 (S.D.N.Y. 2014) ("Although the presence of a disclaimer or other clarifying language may defeat a claim of deception, the Court cannot hold as a matter of law that the product labels are not

misleading to a reasonable consumer) (quotations and citation omitted); *see also Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 464 (E.D.N.Y. 2013) ("[a]t this early stage of the litigation, it cannot be determined whether a disclaimer . . . eliminates the possibility of a reasonable consumer being misled . . ."); *Ackerman v. Coca-Cola Co.*, No. 09- CV-0395, 2010 U.S. Dist. LEXIS 73156, at *62-63 (E.D.N.Y. July 21, 2010) ("[T]he presence of a nutritional panel, though relevant, does not as a matter of law extinguish the possibility that reasonable consumers could be misled by [the defendant]'s labeling and marketing").

55.    In any case, the Product bags do not contain an actual unit count, although an unusually diligent consumer could derive the count by multiplying the number of servings by the number of pieces per serving.

**Defendant Misrepresents the Product's Effect on Blood Glucose Levels**

56.    The Product includes on the back label the effect sugar alcohols has on blood glucose levels. Below is an image of the claim:



57.    This claim misrepresents the effect the Product actually has on blood glucose levels because the Product contains maltitol syrup, as shown below:



58.     Maltitol syrup has an effect on blood sugar levels closer to table sugar than to fiber. Sucrose, table sugar, has a glycemic index ( or "GI") of 63, and maltitol syrup has a GI ranging from 36 to 53—less than sucrose, but far from insignificant.

59.     The testimony of many nutritionists, physicians, researchers, and other health professionals makes clear that sugar alcohols have a significant effect on blood sugar levels:

> Some Nutrition Facts labels may also list sugar alcohols under total carbohydrate. Sugar alcohols may be found in products that are labeled "sugar-free" or "no sugar added." This can include sugar-free candies, chocolate, and energy bars. But don't be fooled—sugar alcohols are still a form of carbohydrate, and they still affect your blood sugar levels, if not as dramatically. Because sugar alcohols are hard for the body to digest, the effect on blood sugar levels is less than standard sugar. When counting carbohydrates for products made with sugar alcohols, subtract half of the grams of sugar alcohol listed on the food label from the total grams of carbohydrate.

Diabetes Teaching Center at the University of California, San Francisco[5]

> This is the general concept that is now being applied—but with a twist—to the new food labels with "net carbs" or "zero carbs that count." The main concern with these new food labels is that the subtraction process has been generalized to all fiber grams and all sugar alcohols. However, eating sugar alcohols can cause blood sugar to rise.

Department of Human Nutrition, Kansas State University[6]

---

[5] https://dtc.ucsf.edu/living-with-diabetes/diet-and-nutrition/understanding-carbohydrates/counting-carbohydrates/learning-to-read-labels/counting-sugar-alcohols/ (last viewed 1/2/18).

[T]he glucose of moiety of maltitol is absorbed and provides carbohydrates to the body for metabolism. In a study conducted by Felber and colleagues, carbohydrate oxidation increased and lipid oxidation decreased after normal subjects consumer 30 g of maltitol, although the magnitude of these effects was smaller than that observed after consumption of 30 g of sucrose.

The glycemic response after maltitol administration was approximately 25% of that observed after administration of an equal amount of glucose [citation omitted] and 55% of that after an equal amount of sucrose. [citation omitted]

[R]esearch suggests that the glycemic effect of sugar alcohols depends on the type of sugar alcohol and on the nature of the food into which it is incorporated. Sorbitol, lactitol and xylitol do not raise PG [citations omitted]; however, maltitol and HSHs have demonstrated a modest effect on PG [citations omitted]. In fact, chocolate sweetened with maltitol elicited the same PG response in normal subjects as did chocolate sweetened with sucrose [citation omitted].

Thomas M.S. Wolever[7]

[T]he labels on a number of foods state that maltitol has a minimal impact on blood sugar. Some studies suggest that maltitol raised blood sugar less than sucrose. However, in other studies, maltitol has a glycemic index of 73, which is higher than that of sucrose (61).

The Center for Science in the Public Interest wrote to the FDA[8]

60.    Maltitol's effect on blood sugar level is far from minimal. Defendant's claim that sugar alcohols will "only cause a small rise in blood glucose levels" is false and deceptive to consumers. As a result, Plaintiff and the Class members were misled by Defendant.

**Plaintiff and the Class Were Injured as a Result of Defendant's Deceptive Conduct**

61.    Plaintiff and Class members were injured as the result of Defendant's deceptive conduct because they paid money for less Product than Defendant represented they would be receiving. Plaintiff and the Class were deprived of the benefit of their bargain.

---

[6] https://www.ksre.k-state.edu/humannutrition/nutrition-topics/eatingwell-diabetes/diabetes-documents/Net_Carbs.pdf (last viewed 1/2/18).
[7] Thomas M.S. Wolever MD, PhD, Ana Piekarz RD, Marjorie Hollands MSC RD CDE, Katherine Younker MBA RD CDE, Canadian Journal of Diabetes, 2002; 26(4): 356-362, pgs. 357-360.
[8] http://www.fda.gov/ohrms/dockets/dailys/04/july04/071604/04p-0297-cp00001-01-vol1.pdf (last viewed 1/2/18).

62.    Defendant's Smaller Werther's bag candy demonstrates that a bag of Werther's candy contains **at most** 33% functional slack-fill, and therefore should contain **at least** 67% candy. However Plaintiff KPAKPOE-AWEI paid $3.58 for a bag of the Product and her bag was only about 31% full of candy, with slack-fill of about 69%.

63.    Since the Product bag was 31% full when it should have been **at least** 67% full, Plaintiff received **at most** 46%[9] of what she bargained for. Accordingly, **at least** 54%[10] of the purchase price, or about $1.93[11] was unlawfully taken.

64.    In order for Plaintiff and Class members to be made whole, they must be compensated in an amount of the proportion of the purchase price equal to the percentage of non-functional slack-fill in the Product, which is equivalent to the amount of product Plaintiff and the Class paid for that Defendant did not-deliver. *See Lazaroff v. Paraco Gas Corp.*, 2011 NY Slip Op 52541(U), ¶ 6, 38 Misc. 3d 1217(A), 1217A, 967 N.Y.S.2d 867, 867 (Sup. Ct.) ("Plaintiff alleges that, had he understood the true amount of the product, he would not have purchased it, and that he and the purported members of the class paid a higher price per gallon/pound of propane and failed to receive what was promised and/or the benefit of his bargain, i.e., a full 20 pound cylinder and the amount of propane he was promised. . . Thus, plaintiff has properly alleged injury. Accordingly, the court finds that the plaintiff has stated a claim for a violation of GBL § 349."); *Waldman v. New Chapter*, *Inc.*, 714 F. Supp. 2d 398, 406 (E.D.N.Y. 2010) ("Plaintiff alleges that, had she understood 'the true amount of the product,' she 'would not have purchased' it. . . Thus, Plaintiff has properly alleged injury. Accordingly, Plaintiff's § 349 claim survives Defendant's motion); *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489 (KMK),

---

[9]  $\dfrac{31\% \text{ actual fill}}{67\% \text{ minimum expected fill}} = 46\%$

[10]  100% - 45% = 54%.

[11]  54% x $3.58 = $1.93.

2016 U.S. Dist. LEXIS 107097, at *51-52 (S.D.N.Y. Aug. 11, 2016) ("Indeed, in his Complaint, Plaintiff seeks monetary damages on the grounds that he 'would not have paid the premium price she paid' to buy the Product had he 'known the truth.'. . . Case law makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive.").

## CLASS ACTION ALLEGATIONS

65.     Plaintiff KPAKPOE-AWEI brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities in the United States who made retail purchases of the Product during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Nationwide Class").

66.     In the alternative, Plaintiff KPAKPOE-AWEI seeks to represent:

> All persons who made retail purchases of the Product in New York during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the New York Class").

67.     The proposed Classes exclude current and former officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, Defendant's legal representatives, heirs, successors, assigns, and any entity in which they have or have had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

68.     Class members are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through the appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Classes. Other members of the Classes may be identified from records maintained by Defendant and may be notified of the pendency of this action by mail, or by advertisement, using the form of notice similar to that customarily used in class actions such as this.

69.     Plaintiff's claims are typical of the claims Class members as they all are similarly affected by Defendant's wrongful conduct.

70.     Plaintiff will fairly and adequately protect the interests of the Class members in that Plaintiff has no interests antagonistic to them. Plaintiff has retained experienced and competent counsel.

71.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the Class members to individually seek redress for the wrongful conduct alleged herein.

72.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members. These include:

   i.  Whether Defendant labeled, packaged, marketed, advertised and/or sold the Product to Plaintiff and Class members using false, misleading and/or deceptive packaging and labeling;

   ii.  Whether Defendant's actions constitute violations of 21 U.S.C. § 343(d);

   iii.  Whether Defendant omitted and/or misrepresented material facts in connection with the labeling, packaging, marketing, advertising and/or sale of its Product;

   iv.  Whether Defendant's labeling, packaging, marketing, advertising and/or selling of its Product constituted an unfair, unlawful or fraudulent practice;

   v.  Whether the packaging of the Product during the class period contained unlawful non-functional slack-fill;

   vi.  Whether, and to what extent, injunctive relief should be imposed on Defendant to prevent future misconduct;

vii.   Whether Class members have sustained damages as a result of Defendant's wrongful conduct;

viii.   Whether Defendant purposely chose non-transparent Product packaging so that Plaintiff and Class members would not be able to see the amount of slack-fill contained in the Product;

ix.   The appropriate measure of damages and/or other relief.

73.   The membership of the Classes is readily definable, and prosecution of this action as a class action will reduce the possibility of repetitious litigation. Plaintiff knows of no difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

74.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual Class member are too small to make it economically feasible for an individual Class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will prevent the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

75.   The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

76.   The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Classes

predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

77.    The prosecution of separate actions by individual Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. Additionally, individual actions may be dispositive of the interest of all Class members, although certain Class members are not parties to such actions.

78.    Defendant's conduct is generally applicable to the Classes as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Classes as a whole. As such, Defendant's systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

## CAUSES OF ACTION

### COUNT I

### INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar consumer protection law of other states and the District of Columbia to the extent New York law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

79.    Plaintiff KPAKPOE-AWEI realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

80.    Plaintiff KPAKPOE-AWEI brings this claim individually and on behalf of the other members of the Class for an injunction for violations of New York's Deceptive Acts or Practices Law, General Business Law ("NY GBL") § 349.

81.    NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

28

82.    Under the New York Gen. Bus. Code § 349, it is not necessary to prove justifiable reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 . . . claims, it was error. Justifiable reliance by the plaintiff is not an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) (internal citations omitted)).

83.    The practices employed by Defendant, whereby Defendant advertised, promoted, marketed and sold its Product in packaging containing non-functional slack-fill are unfair, deceptive and misleading and are in violation of the NY GBL § 349. Moreover, New York State law broadly prohibits the misbranding of foods in language identical to that found in regulations promulgated pursuant to the FDCA § 403 (21 U.S.C. 343(d)). Under New York Agm. Law § 201, "[f]ood shall be deemed to be misbranded … If its container is so made, formed, colored or filled as to be misleading."

84.    The foregoing deceptive acts and practices were directed at consumers.

85.    Defendant should be enjoined from packaging its Product with non-functional slack-fill, as described above, pursuant to NY GBL § 349.

86.    Absent an injunction, Plaintiff KPAKPOE-AWEI is at risk of continued injury because she can no longer rely on Defendant's packaging, even if the nonfunctional slack-fill is corrected. Plaintiff KPAKPOE-AWEI might hesitate to purchase Defendant's products even if it ceases its unlawful packaging practices and begins packaging its products without slack-fill. If the products are no longer sold with non-functional slack-fill, then Plaintiff KPAKPOE-AWEI could not take advantage of those products because she has been misled into believing that the products have non-functional slack-fill. The 9th Circuit has recently embraced this approach:

> We hold that a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now

knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an "actual and imminent, not conjectural or hypothetical" threat of future harm. [*Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142, 1148 (2009).] Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future. In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to. *See, e.g.*, [*Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012)]; *Lilly v. Jamba Juice Co.*, No. 13-cv-02998-JT, 2015 U.S. Dist. LEXIS 34498, 2015 WL 1248027, at *4 (N.D. Cal. Mar. 18, 2015) ("[U]nless the manufacturer or seller has been enjoined from making the same representation, [the] consumer . . . won't know whether it makes sense to spend her money on the product.").

*Davidson v. Kimberly-Clark Corp.,* 873 F.3d 1103, 1115 (9th Cir. 2017).

87.     The Court should follow the lead of California Federal Courts and recognize that a plaintiff may be injured after she learns of a manufacturer's deception, even though she is unlikely to fall victim to the exactly the same scheme again in exactly the same manner. To hold otherwise would immunize manufacturers and render injunctive relief impossible in consumer fraud class action lawsuits – if learning of a deception removed a Plaintiff's standing to seek an injunction, then wrongdoers could violate the law with impunity, defeating the purpose of consumer protection statutes.

88.     Plaintiff KPAKPOE-AWEI, on behalf of herself and all others similarly situated, respectfully demands a judgment enjoining Defendant's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

## COUNT II

### DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar consumer protection law of other states and the District of Columbia to the extent New**

York law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of
the New York Class)

89.    Plaintiff KPAKPOE-AWEI realleges and incorporates herein by reference the
allegations contained in all preceding paragraphs, and further alleges as follows:

90.    Plaintiff KPAKPOE-AWEI brings this claim individually and on behalf of the
other members of the Class for violations of NY GBL § 349.

91.    Any person who has been injured by reason of any violation of NY GBL § 349
may bring an action in her own name to enjoin such unlawful acts or practices, an action to
recover her actual damages or fifty dollars, whichever is greater, or both such actions. The court
may, in its discretion, increase the award of damages to an amount not to exceed three times the
actual damages up to one thousand dollars, if the court finds the defendant willfully or
knowingly violated this section. The court may award reasonable attorney's fees to a prevailing
plaintiff.

92.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive
acts and practices by misbranding its Product so that it appears to contain more in the packaging
than is actually included.

93.    The practices employed by Defendant, whereby Defendant advertised, promoted,
marketed and sold its Product in packages containing non-functional slack-fill are unfair,
deceptive and misleading and are in violation of the NY GBL § 349, New York Agm. Law § 201
and the FDCA (21 U.S.C. § 343(d)) in that said Product is misbranded.

94.    The foregoing deceptive acts and practices were directed at consumers.

95.    Plaintiff KPAKPOE-AWEI and the other Class members suffered a loss as a
result of Defendant's deceptive and unfair trade practices. Specifically, as a result of Defendant's
deceptive and unfair acts and practices, Plaintiff KPAKPOE-AWEI and the other Class members

31

suffered monetary losses from the purchase of Product, i.e., receiving less than the capacity of

the packaging due to non-functional slack-fill in the Product. In order for Plaintiff KPAKPOE-

AWEI and Class members to be made whole, they must receive a refund of the purchase price of

the Product equal to the percentage of non-functional slack-fill in it.

## COUNT III

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §§ 350 AND 350-a(1)
### (FALSE ADVERTISING)

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar consumer protection law of other states and the District of Columbia to the extent New York law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

96.    This claim is brought on behalf of Plaintiff KPAKPOE-AWEI and members of

the Class against Defendant.

97.    Plaintiff KPAKPOE-AWEI realleges and incorporates by reference the

allegations contained in all preceding paragraphs, and further alleges as follows:

98.    Defendant has been and/or is engaged in the "conduct of . . . business, trade or

commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

99.    New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the

conduct of any business, trade or commerce." False advertising means "advertising, including

labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into

account "the extent to which the advertising fails to reveal facts material in light of . . .

representations [made] with respect to the commodity . . . " N.Y. Gen. Bus. Law § 350-a(1).

100.    Pursuant to the FDCA as implemented through 21 C.F.R. § 100.100, package size

is an affirmative representation of quantity. Thus, the non-functional slack-fill in Defendant's

Product constituted false advertising as to the quantity of candy contained therein. Defendant

caused this false advertising to be made and disseminated throughout New York and the United

States. Defendant's false advertising was known, or through the exercise of reasonable care should have been known, by Defendant to be deceptive and misleading to consumers.

101. Defendant's affirmative misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers purchasing the Product were, and continue to be, exposed to Defendant's material misrepresentations.

102. Defendant has violated N.Y. Gen. Bus. Law § 350 because its misrepresentations and/or omissions regarding the Product, as set forth above, were material and likely to deceive a reasonable consumer.

103. Plaintiff KPAKPOE-AWEI and members of the Class have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising. In purchasing the Product, Plaintiff KPAKPOE-AWEI and members of the Class relied on the misrepresentations regarding the quantity of the Product that was actually candy rather than non-functional slack-fill. Those representations were false and/or misleading because the Product contains substantial hidden non-functional slack-fill. Plaintiff and the Class were deprived of the benefit of their bargains when they purchased the Product and received mostly air.

104. Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff KPAKPOE-AWEI and members of the Class seek monetary damages (including actual, minimum, punitive, treble, and/or statutory damages), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**COUNT IV**

**COMMON LAW FRAUD**

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent New York common**

33

law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the
New York Class)

105.    Plaintiff realleges and incorporates herein by reference the allegations contained
in all preceding paragraphs, and further alleges as follows:

106.    Through its product packaging, Defendant intentionally made materially false and
misleading representations regarding the quantity of candy that purchasers were actually
receiving.

107.    Plaintiff and Class members were induced by, and relied upon, Defendant's false
and misleading representations and did not know the truth about the Product at the time they
purchased it.

108.    Defendant knew of its false and misleading representations. Defendant
nevertheless continued to promote and encourage customers to purchase the Product in a
misleading and deceptive manner, intending that Plaintiff and the Class rely on its
misrepresentations.

109.    Had Plaintiff and the Class known the actual amount of candy they were
receiving, they would not have purchased the Product.

110.    Plaintiff and Class members have been injured as a result of Defendant's
fraudulent conduct.

111.    Defendant is liable to Plaintiff and Class members for damages sustained as a
result of Defendant's fraud. In order for Plaintiff and Class members to be made whole, they
need to receive a refund compensating them for the shortfall in the Products they purchased.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated, seeks judgment against Defendant, as follows:

a.  An Order that this action be maintained as a class action and appointing Plaintiff as representative of the Nationwide Class or, in the alternative, the New York Class;

b.  An Order appointing the undersigned attorney as class counsel in this action;

c.  Restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

d.  All recoverable compensatory and other damages sustained by Plaintiff and the Class;

e.  Actual and/or statutory damages for injuries suffered by Plaintiff and the Class and in the maximum amount permitted by applicable law;

f.  An order (i) requiring Defendant to immediately cease its wrongful conduct as set forth in this Complaint; (ii) enjoining Defendant from continuing to misrepresent and conceal material information and conduct business via the unlawful, unfair and deceptive business acts and practices complained of herein; (iii) ordering Defendant to engage in a corrective advertising campaign; and (iv) requiring Defendant to reimburse Plaintiff and all members of the Class in an amount up to the purchase price of the Product;

g.  Statutory pre-judgment and post-judgment interest on any amounts;

h.  Payment of reasonable attorneys' fees and costs; and

i.  Such other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff, individually and on behalf of all others similarly situated, hereby demands a jury trial on all claims so triable.


Dated: February 7, 2018

Respectfully submitted,


/s/ *C.K. Lee*
By: C.K. Lee, Esq.

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*